IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| IN RE QIMONDA AG,<br>    **Debtor in a Foreign Proceeding.** | )<br>)<br>)<br>) |
| MICHAEL JAFFÉ,<br>    Appellant, | )<br>)<br>) |
| v. | )<br>) |
| SAMSUNG ELECTRONICS CO., LTD.,<br>*et al.*,<br>    Appellees. | )<br>)<br>)<br>) |

**Civil Action No. 1:12-cv-0008**

## MEMORANDUM OPINION

This cross-border bankruptcy appeal presents a seldom litigated question concerning the proper application of 28 U.S.C. § 158(d)(2), which permits a direct appeal from the bankruptcy court to the court of appeals, bypassing the district court. The primary question on appeal is whether 11 U.S.C. § 365(n) or § 103 of the German Insolvency Code should apply to the patent licensing agreements at issue in this case. This is a determination of considerable consequence to the parties because the two provisions differ markedly. Under § 103 of the German Insolvency Code, a debtor may terminate a licensee's right to use the debtor's patents, while under 11 U.S.C. § 365(n), licensees of intellectual property rights may elect to retain their rights under licensing agreements.[1] For the reasons that follow, certification of the bankruptcy court's order for direct appeal is appropriate.

---

[1] Although the application of the German provision in these circumstances has not yet been decided by Germany's highest court, the district court and the bankruptcy court both concluded that § 365(n) and German Insolvency Code § 103 are at odds here. *See In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 565 n. 28 (E.D. Va. 2010).

**I.**

Debtor Qimonda AG (hereinafter "Qimonda") is a German company involved in the design, manufacture, and sale of semiconductor products. Qimonda claims to hold over 10,000 patents, of which at least 4,000 are U.S. patents, as well as over 1,000 pending U.S. patent applications. These patents are Qimonda's most valuable remaining asset. *In re Qimonda AG*, 462 B.R. 165, 168-169 (Bankr. E.D. Va. 2011).

Appellees are Samsung Electronics Co., Ltd. ("Samsung"), Infineon Technologies AG ("Infineon"), International Business Machines Corp. ("IBM"), Hynix Semiconductor, Inc. ("Hynix"), Intel Corporation ("Intel"), Nanya Technology Corporation ("Nanya"), and Micron Technology, Inc. ("Micron") (collectively referred to as "the Objectors"). The Objectors are international electronic companies, some headquartered in the United States and some abroad, that manufacture and sell semiconductor products. The Objectors entered into various cross-licensing and joint venture agreements with Qimonda or its predecessor companies and hold licensing rights to U.S. and international patents held by Qimonda. Pursuant to these agreements, Qimonda and appellants have perpetually and irrevocably cross-licensed tens of thousands of patents. *See In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 552 (E.D. Va. 2010).[2]

Cross-licensing agreements, such as those at issue here, are highly beneficial in the semiconductor industry. *In re Qimonda AG*, 462 B.R. at 175. Due to the number of potentially applicable patents implicated by any given semiconductor device, "it is not always possible to identify which [patents] might cover a new product, and in any event it

---

[2] In its memorandum opinion, the bankruptcy court provided detailed descriptions of each company and its licensing agreements with Qimonda. *See In re Qimonda AG*, 462 B.R. at 169-174.

would be all but impossible to design around each and every patented technology[.]" *Id.* This "patent thicket" compels manufacturers to "obtain licenses to many different patents held by many different owners in order to protect against potential infringement claims." *Id.* Reliance on these agreements is especially critical owing to the costs required to construct facilities that manufacture semiconductor chips, often in the range of two to five billion dollars. *Id.*

## II.

In January 2009, Qimonda commenced insolvency proceedings in Munich Germany. In April 2009, the German insolvency court appointed appellant Michael Jaffé, a German attorney who specializes in insolvency law, as the insolvency administrator of Qimonda's estate. In June 2009, Jaffé (hereinafter "the Foreign Administrator") filed a petition for recognition of the German insolvency proceeding in the U.S. Bankruptcy Court for the Eastern District of Virginia under Chapter 15 of the Bankruptcy Code. On July 22, 2009, the bankruptcy court recognized the Germany insolvency proceeding as a foreign main proceeding and appointed Jaffé as the foreign representative. Also by order dated July 22, 2009 (hereinafter "the July 22, 2009 supplemental order"), the bankruptcy court made, *inter alia*, the entirety of 11 U.S.C. § 365 applicable to this proceeding. As a result, when the Foreign Administrator attempted to elect nonperformance of patent licensing agreements pursuant to German Insolvency Code § 103, certain Objectors balked, citing § 365(n), applicable pursuant to the bankruptcy court's July 22, 2009 supplemental order. In response, the Foreign Administrator filed a motion requesting an amendment to the July 22, 2009 supplemental order that conditioned the applicability of § 365(n). The bankruptcy court granted the

Foreign Administrator's motion to amend the July 22, 2009 supplemental order on November 19, 2009.

In order to gain a complete picture of the parties' dispute and the nature of this appeal, three proceedings must be reviewed: (i) the bankruptcy court's November 19, 2009 decision to grant the Foreign Administrator's motion to amend the July 22, 2009 supplemental order, (ii) the first appeal of that decision to the district court, and (iii) the evidentiary hearing in the bankruptcy court following remand by the district court.

**A.**

In its motion requesting an amendment to the July 22, 2009 supplemental order, the Foreign Administrator requested that the bankruptcy court (i) remove the reference to § 365 entirely, or in the alternative, (ii) insert a proviso that "Section 365(n) applies only if the Foreign Representative rejects an executory contract pursuant to Section 365 (rather than simply exercising the rights granted to the Foreign Representative pursuant to the German Insolvency Code)." On November 19, 2009, the bankruptcy court granted the Foreign Administrator's motion.   In an accompanying memorandum opinion, the bankruptcy court provided the following reasons for its decision:

(i)     that the application of § 365 to Qimonda's patent portfolio would substantially undermine the Germany Insolvency Code § 103, which permits an administrator to elect nonperformance of an executory contract;

(ii)    that § 365 must give way to the German Insolvency Code because "[a]ncillary proceedings such as this Chapter 15 proceeding pending in this court should supplement, but not supplant, the German proceeding";

(iii)   that "[i]f the patents and patent licenses are dealt with in accordance with the bankruptcy laws of the various nations in which the licensees or licensors may be located or operating, there will be many inconsistent results";

(iv)     that the inconsistent treatment of Qimonda's patent portfolio may result in the portfolio being "splintered" or "shattered into many pieces that can never be reconstructed";

(v)      that the application of § 365(n) to only certain patents in Qimonda's portfolio will "diminish[] the value of these assets" and "may well be detrimental to parties who are or wish to license the patents";

(vi)     that it was an "unfortunate but inevitable result" of Qimonda's insolvency and the Foreign Administrator's election of nonperformance under the German Insolvency Code that the licensees would be forced "to bid for licenses for which they have already paid"; and

(vii)    that "[a]ll patents should be treated the same" on the ground that "[t]here should not be disparate results simply because of the location of a factory or research facility or corporate office."

*In re Qimonda AG Bankr. Litig.,* 433 B.R. at 554 (*quoting In re Qimonda AG*, No. 09-

14766, 2009 WL 4060083 (Bankr. E.D. Va. Nov. 19, 2009)).

**B.**

The Objectors[3] appealed the order amending the July 22, 2009 supplemental

order.  The district court heard the appeal and, on July 2, 2010, remanded the matter for

further fact-finding.  In reaching this decision, the district court decided four disputes

between the parties, each discussed below.

**i.**

The first dispute was the proper standard of review for the bankruptcy court's

decision to grant comity to German law.  Typically, a bankruptcy court's decision to

defer to foreign law under comity principles is reviewed for an abuse of discretion.

_____

[3] The parties to the first appeal overlap, but are not identical with, the parties to the present appeal.  Nonetheless, for purposes of simplicity, both groups will be referred to simply as "the Objectors."

While the Objectors cited a Second Circuit case to suggest a *de novo* standard may apply, that case was neither persuasive nor controlling in the circumstance. *See In re Qimonda AG Bankr. Litig.*, 433 B.R. at 555-556. As a result, the district court concluded that a review for abuse of discretion was appropriate.

ii.

The Objectors next argued that the bankruptcy court's decision to amend the July 22, 2009 supplemental order was inconsistent with the procedural requirements of both Rule 60(b), Fed.R.Civ.P., and 11 U.S.C. § 1522. With respect to the former, the district court determined that Rule 60(b) was not applicable because the July 22, 2009 supplemental order was not a final order within the meaning of Rule 60(b).[4]

The Objectors' argument with respect to § 1522 was more successful. The July 22, 2009 supplemental order was issued pursuant to 11 U.S.C. § 1521(a), which provides that upon recognition of a foreign proceeding, a bankruptcy court may discretionarily "grant any appropriate relief" to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." § 1521(a). Thus, pursuant to its

---

[4] While the order was not final within the meaning of Rule 60(b), it was still a final order for purposes of appeal. *See Indemnity Ins. Co. of N. Am. v. Reisley*, 153 F.2d 296, 299 n. 5 (2d Cir. 1945) ("This in no way implies that an order in a 'controversy arising in a proceeding in bankruptcy' may not be final for the purpose of taking an appeal therefrom."). The bankruptcy court's order is a final order for purposes of appeal because it disposes of a discrete dispute within a larger case. *See In re Computer Learning Centers, Inc.*, 407 F.3d 656, 660 (4th Cir. 2005) (*quoting In re Saco Local Dev. Corp.*, 711 F.2d 441, 444 (1st Cir. 1983)). *See also McDow v. Dudley*, 662 F.3d 284, 287 (4th Cir. 2011) ("[T]he concept of finality in bankruptcy cases has traditionally been applied in a more pragmatic and less technical way[.]") (quotation marks and citations omitted); *In re Swyter*, 263 B.R. 742, 746 (E.D. Va. 2001) ("[A]n order is final and appealable if it (i) finally determines or seriously affects a party's substantive rights, or (ii) will cause irreparable harm to the losing party or waste judicial resources if the appeal is deferred until the conclusion of the bankruptcy case.").

authority under § 1521(a), the bankruptcy court applied § 365 and other provisions to the proceeding in the July 22, 2009 supplemental order. The subsequent amendment to the order was authorized under 11 U.S.C. § 1522(c), which permits modification of an order issued pursuant to § 1521(a). Importantly, however, such modification is only permissible "*if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.*" § 1522(a) (emphasis added). In this respect, the district court concluded "[i]t is unclear on this somewhat anemic record whether the Bankruptcy Court adequately balanced the parties' interests, as required by § 1522." *In re Qimonda AG Bankr. Litig.,* 433 B.R. at 558. As a result, the matter was remanded so that the bankruptcy court could "articulate more fully and explicitly its basis for modifying the discretionary relief previously granted." *Id.*

### iii.

The parties next disputed whether the bankruptcy court erred in treating the application of § 365(n) as a decision within its discretion rather than as required by 11 U.S.C. § 1520(a). The bankruptcy code identifies those provisions that apply automatically upon recognition of a foreign main proceeding in 11 U.S.C. § 1520(a) and provides a non-exclusive list of provisions that may be applied at the discretion of the bankruptcy court in 11 U.S.C. § 1521(a). Section 365 is not expressly listed as applying either automatically or discretionarily, and thus is a provision that is appropriately considered discretionary under § 1521(a). Nonetheless, the Objectors argued that § 365(n) is implicitly referenced in § 1520(a)'s mandatory provisions, because (i) § 1520(a) includes § 363, and (ii) § 363(*l*) references § 365(n). The district court found this

argument unpersuasive and held, as a matter of law, the application of § 365(n) to a Chapter 15 proceeding is within discretion of the bankruptcy court.

iv.

Finally, the parties disputed whether the bankruptcy court erred in deferring to the Germany Insolvency Code under comity principles.  Section 1509(b)(3) provides that in Chapter 15 proceedings, "a court in the United States *shall* grant comity or cooperation to the foreign representative."  11 U.S.C. § 1509(b)(3) (emphasis added).  This instruction is limited by 11 U.S.C. § 1506, which states "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Accordingly, the district court determined that these section

> read in *pari materia*, provide that comity shall be granted following the U.S. recognition of a foreign proceeding under Chapter 15, subject to the caveat that comity shall not be granted when doing so would contravene fundamental U.S. public policy.

*In re Qimonda AG Bankr. Litig.*, 433 B.R. at 565.  The district court then identified three principles to guide application of the § 1506 exception:

> (1) The mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception.

> (2) Deference to a foreign proceeding should not be afforded in a Chapter 15 proceeding where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections.

> (3) An action should not be taken in a Chapter 15 proceeding where taking such action would frustrate a U.S. court's ability to administer the Chapter 15 proceeding and/or would impinge severely a U.S. constitutional or statutory right, particularly if a party continues to enjoy the benefits of the Chapter 15 proceeding.

*In re Qimonda AG Bankr. Litig.*, 433 B.R. at 570. The district court then determined that because the bankruptcy court had not adequately addressed whether application of German insolvency law would contravene a fundamental U.S. public policy, the matter must be remanded for further fact-finding and elaboration.

In sum, the district court affirmed the bankruptcy court's determination that § 365(n) was discretionary, but remanded the matter because (i) the bankruptcy court did not adequately articulate the balance of the parties' respective interests under § 1522, and (ii) the bankruptcy court did not address or resolve whether conditioning the applicability of § 365(n) was an action "manifestly contrary to the public policy of the United States." *In re Qimonda AG Bankr. Litig.*, 433 B.R. at 571.

### C.

On remand, the bankruptcy court held a four-day evidentiary hearing.[5] During the hearing, testimony was presented regarding the impact of applying German insolvency law on the parties as well as the broader impact on the semiconductor industry and the U.S. economy as a whole. In this respect, on behalf of the Objectors, an expert testified "that increased uncertainty regarding the enforceability of patent licenses would necessarily lead to decreased investments, at least at the margin, as well as less spending on research and development, and less innovation" in the semiconductor industry, and such innovation is "key to the continued health of the United States economy." *In re*

---

[5] Following remand, three additional companies – IBM, Hynix, and Intel – were allowed to intervene and are appellees here. As a result of a conflict involving one of the intervenors, the Honorable Robert G. Mayer, who had presided over the prior bankruptcy proceedings, recused himself, and the matter was transferred to the Honorable Stephen S. Mitchell.

*Qimonda AG*, 462 B.R. at 176.[6]  Not surprisingly, the Foreign Administrator's expert disagreed that the Objectors' research and development would be impaired by application of Germany insolvency law, but calculated that the loss to Qimonda's estate as result of the application of § 365(n) would be approximately $47 million. *Id.* at 177.  The expert further testified that in light of the fact that the Foreign Administrator was willing to re-license the Qimonda patents to the Objectors, the application of German insolvency law would simply require the Objectors pay "fair value for rights to use the technology embodied in the portfolio." *Id.*

Based on the thorough record developed on remand, and applying the principles identified by the district court, *see* Section II(B), *supra*, the bankruptcy court issued an order and accompanying memorandum opinion (hereinafter "the October 28, 2011 order"), in which it held that (i) balancing the interests of the parties, as required by § 1522, weighed in favor of making § 365(n) applicable, and (ii) limiting the applicability of § 365(n) was a prohibited action "manifestly contrary to the public policy of the United States" under § 1506.

With respect to its first conclusion, the bankruptcy court held that while it is true that application of § 365(n) would result in less value being realized by the Qimonda estate, applying § 365(n) would by no means render the patent portfolio worthless.  On the other hand, the bankruptcy court found that if German insolvency law were applied,

---

[6] Although none of the Objectors "identified any specific U.S. patent owned by Qimonda, the cancellation of which would jeopardize their continued manufacture or sale within the United States of any particular product," the bankruptcy court found this lack of specificity "not at all surprising, since the whole point of portfolio cross-licenses is to eliminate the necessity (and in some cases impossibility) of individually analyzing each and every patent that might possibly apply to determine if a new design infringes on it." *In re Qimonda AG*, 462 B.R. at 181.

> the risk to the very substantial investment the [O]bjectors—particularly IBM, Micron, Intel, and Samsung—have collectively made in research and manufacturing facilities in the United States in reliance on the design freedom provided by the cross-license agreements, though not easily quantifiable, is nevertheless very real.

*Id.* at 182-183. Recognizing it was a close question, the bankruptcy court held that although it could not identify a specific dollar impact on the Objectors, the significant risk of harm to their investments outweighed the quantified harm ($47 million) to the Qimonda estate.

With respect to its second conclusion, the bankruptcy court, applying the standards outlined by the district court, held that

> failure to apply § 365(n) under the circumstances of this case and this industry would "severely impinge" an important statutory protection accorded licensees of U.S. patents and thereby undermine a fundamental U.S. public policy promoting technological innovation.

*Id.* at 185. In reaching this conclusion, the bankruptcy court considered the legislative history of § 365(n)[7] as well as the testimony of the parties' dueling experts. Specifically, the bankruptcy court found that although the industry in question often involved patent threats and patent litigation, and although "innovation would obviously not come to a grinding halt if licenses to U.S. patents could be cancelled in a foreign insolvency proceeding," the uncertainty created by the application of German insolvency law "would nevertheless slow the *pace* of innovation, to the detriment of the U.S. economy." *Id.* at 185.

---

[7] This history is discussed *infra* and in detail in the district court's prior opinion. *See In re Qimonda AG Bankr. Litig.,* 433 B.R. at 566-567.

**D.**

The Foreign Administrator noticed an appeal of the October 28, 2011 order and seeks certification for a direct appeal to the Fourth Circuit, pursuant to 28 U.S.C. § 158(d)(2). The request for certification of this order, which is a final order for purposes of appeal, is properly considered at this time by the district court, where the matter is currently pending. *See* Rule 8001(f)(2), Fed.R.Bankr.P. ("A matter is pending in a district court or bankruptcy appellate panel after the docketing, in accordance with Rule 8007(b), of an appeal taken under 28 U.S.C. §158(a)(1) or (2), or the grant of leave to appeal under 28 U.S.C. §158(a)(3).").

**III.**

As part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Congress enacted 28 U.S.C. § 158(d)(2), which permits direct appeals from the bankruptcy court to the court of appeals in certain circumstances. The two primary goals behind this provision are (i) to provide a quicker and less costly means of resolving significant issues that are inevitably bound for the court of appeals, and (ii) to facilitate the development of more binding precedents in bankruptcy law.[8] In application, certification pursuant to § 158(d)(2) is a two-step process. First, the bankruptcy court, district court, or bankruptcy appellate panel must certify a judgment, order or decree for

---

[8] *See* H.R. Rep. No. 109-31(I), at 148 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 206 (Section 158(d)(2) enacted to address "the time and cost factors attendant to the present appellate system" as well as the fact that "decisions rendered by a district court as well as a bankruptcy appellate panel are generally not binding and lack stare decisis value."). *See also* Laura B. Bartell, *The Appeal of Direct Appeal – Use of the New 28 U.S.C. § 158(D)(2)*, 84 Am. Bankr. L.J. 145, 184-186 (2010).

direct appeal if a statutory trigger is met. Second, the court of appeals decides whether to authorize a direct appeal.

With respect to the first step, a lower court "shall" certify a judgment, order or decree for direct appeal if, *inter alia*, the court, on its own motion or at the request of a party, determines that at least one of the statutory conditions exists. *See* 28 U.S.C. § 158(d)(2)(B). These statutory triggers are:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A).

Unlike the bankruptcy court or district court, which must certify an appeal if one of the statutory conditions is met,[9] the court of appeals exercises discretion in deciding whether to authorize the direct appeal. *See* Collier on Bankruptcy ¶ 5.06[4][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (the "court of appeals are intended to be the gatekeepers here"). The statute provides the court of appeals with no guidance on how to exercise this gatekeeping function, but the House Report provides some direction, stating,

---

[9] *See* 28 U.S.C. § 158(d)(2)(B) ("If… the district court… determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists… then… the district court… *shall* make the certification described in subparagraph (A).") (emphasis added). The legislative history confirms that the district court has no discretion and must certify a direct appeal if one of the statutory conditions is met. *See* H.R. Rep. No. 109-31(I), at 148 ("Such certification must be issued by the lower court if… one or more of certain specified standards are met[.]").

This procedure is intended to be used to settle unresolved questions of law where there is a need to establish clear binding precedent at the court of appeals level, where the matter is one of public importance, where there is a need to resolve conflicting decisions on a question of law, or where an immediate appeal may materially advance the progress of the case or proceeding. The courts of appeals are encouraged to authorize direct appeals in these circumstances. While fact-intensive issues may occasionally offer grounds for certification even when binding precedent already exists on the general legal issue in question, it is anticipated that this procedure will rarely be used in that circumstance or in an attempt to bring to the circuit courts of appeals matters that can appropriately be resolved initially by district court judges or bankruptcy appellate panels.

H.R. Rep. No. 109-31(I), at 148-149.[10]

The Foreign Administrator argues that the district court must certify this appeal because this case involves both (i) multiple questions of law as to which there are no controlling decisions, and (ii) a matter of public importance. The Objectors contend that even if these statutory prerequisites are met, certification is not proper because the district court remanded this case to the bankruptcy court for further factual findings and, as a result, it is outside the intended scope of § 158(d)(2).

---

[10] The Second Circuit has also shed some light on how it plans to exercise its discretion in granting a direct appeal:

> [W]e will be most likely to exercise our discretion to permit a direct appeal where there is uncertainty in the bankruptcy courts (either due to the absence of a controlling legal decision or because conflicting decisions have created confusion) or where we find it patently obvious that the bankruptcy court's decision is either manifestly correct or incorrect, as in such cases we benefit less from the case's prior consideration in the district court and we are more likely to render a decision expeditiously, thereby advancing the progress of the case. On the other hand, we will be reluctant to accept cases for direct appeal when we think that percolation through the district court would cast more light on the issue and facilitate a wise and well-informed decision.

*Weber v. U.S.*, 484 F.3d 154, 161 (2d Cir. 2007).

Prior to seeking certification from the district court, the Foreign Administrator first sought certification in the bankruptcy court. The bankruptcy court determined that the October 28, 2011 order did involve a question of law as to which there is no controlling decision and a matter of public importance, but denied certification, without prejudice, because "any determination of [whether] the district court's mandate has been complied with or whether a sufficient factual record now exists to determine the issues raised on appeal would most appropriately be made by the district court itself." *In re Qimonda AG*, No. 09-14766 (Bankr. E.D. Va. Dec. 19, 2011) (Order) (Doc. 658).[11]

### A.

The first ground for certification asserted by the Foreign Administrator is that the October 28, 2011 order involves questions of law as to which there are no controlling decisions. § 158(d)(2)(A)(i). The Foreign Administrator asserts there are at least three questions of law at issue for which there is no Fourth Circuit or Supreme Court authority:

(i)    Whether foreign laws that permit non-performance of intellectual property licensing agreements by a debtor in bankruptcy may be "manifestly contrary to the public policy of the United States" pursuant to § 1506.

(ii)   Whether § 1522(a)'s directive that creditors' interests be sufficiently protected can be applied to protect creditors from otherwise applicable foreign laws on the basis that U.S. law is more favorable.

(iii)  Whether § 365(n) must be applied as a matter of law in a Chapter 15 proceeding by virtue of § 1520(a).

---

[11] In the bankruptcy court, the Foreign Administrator also argued that certification should be granted because "an immediate appeal… may materially advance the progress of the case[.]" 28 U.S.C. § 158(d)(2)(A)(iii). The bankruptcy court found that this ground was not present, and the Foreign Administrator did not raise it here.

There is no doubt that the third question is a pure question of law as to which there is no controlling authority,[12] and as such, certification by the district court is required.[13]

Whether the other questions raised by the Foreign Administrator also meet the requirements of § 158(d)(2) is a closer question. While it is true that there is no Fourth Circuit or Supreme Court authority addressing either the application of § 1506's public policy exception or § 1522's sufficient protection requirement, it is less clear whether these issues are presented as "questions of law" within the meaning of § 158(d)(2). In considering the proper application of § 158(d)(2), it is helpful to compare and contrast 28 U.S.C. § 1292(b), which provides somewhat similar, although not identical, criteria for certification of interlocutory appeals. *See* Collier on Bankruptcy ¶ 5.06[2] ("[D]ecisions interpreting section 1292(b) will be helpful [in interpreting § 158(d)(2)] but by no means determinative in certain cases."). In applying § 1292(b), courts have often asserted that mixed questions of law and fact or decisions committed to a lower court's discretion are ordinarily not appropriate "questions of law" for certification.[14]  Here, the bankruptcy

---

[12] The fact that this question was raised by the Objectors in their counterstatement does not affect the application of § 158(d)(2), as this question still must be decided by the reviewing court in this appeal.

[13] As the Foreign Administrator correctly points out, the presence of a legal question of first impression requires certification even if other non-qualifying questions are also at issue. *Cf. Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 204-205 (1996) (under similar language in 28 U.S.C. § 1292(b), an order may involve questions other than the pure question of law that triggers certification and may even be decided based on those non-qualifying questions).

[14] *See In re City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002) ("A legal question of the type envisioned in § 1292(b), however, generally does not include matters within the discretion of the trial court."); *Ahrenholz v. Board of Trustees of University of Illinois*, 219 F.3d 674, 677 (7th Cir. 2000) ("The idea was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having

court's analysis of § 1506 and § 1522 involve a factually intensive inquiry, and the final determination under each section is committed to the bankruptcy court's discretion.

The Foreign Administrator responds that while there are mixed questions of law and fact, there are also purely legal questions that are raised that are sufficient to trigger § 158(d)(2). In addition, while the application of § 1506 and § 1522 are committed to the bankruptcy court's discretion, questions of law that address the boundaries of that discretion are suitable for certification.[15]  With respect to § 1506, the Foreign Administrator contends that, as a pure matter of law, § 365(n)'s protection of intellectual property licenses is not the sort of provision that meets § 1506's demanding public policy standard in any industry or on any facts.  In support of this proposition, among other things, the Foreign Administrator argues that because Congress did not expressly require § 365(n) to apply in Chapter 15 proceedings, as a matter of law, it cannot represent a fundamental U.S. public policy that triggers § 1506.  With respect § 1522(a), the Foreign Administrator argues that, as a pure matter of law, the "sufficient protection" requirement

---

to study the record, the court should be enabled to do so without having to wait till the end of the case."); *KPMG Peat Marwick, L.L.P. v. Estate of Nelco, Ltd.*, 250 B.R. 74, 80 (E.D. Va. 2000) (questions of law may be so fact-intensive as to make certification under § 1292(b) inappropriate); 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3930 ("Appellate courts frequently note the inappropriateness of interlocutory review of most discretionary orders.").

[15] *See* 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3930 ("And as with matters of fact, the questions of law that guide the exercise of discretion are as suitable for interlocutory review as any other questions of law.") (*citing In re Virginia Elec. & Power Co.*, 539 F.2d 357, 363-364 (4th Cir. 1976) (although decision to grant a motion for recusal ordinarily is committed to trial judge's discretion and should not be reviewed under § 1292(b), review is appropriate where decision is based on an erroneous understanding of the law guiding the exercise of that discretion)). *Cf. Grode v. Mutual Fire, Marine and Inland Ins. Co.*, 8 F.3d 953, 957 (3rd Cir. 1993) (in context of determining whether to abstain, decision to abstain is within district court's discretion but whether a "case falls in the range within which a district court may exercise discretion [to abstain] is a matter of law.").

does not allow a bankruptcy court to protect creditors from otherwise applicable foreign law, but rather only permits the bankruptcy court to ensure that U.S. creditors are able to participate on equal footing in a foreign proceeding. The Foreign Administrator argues that if these pure questions of law are resolved in its favor, then the subsequent mixed questions of law and fact are never reached. Also, importantly, under § 158(d)(2), unlike § 1292(b), a question of law need not be controlling or subject to a substantial ground for difference of opinion to warrant certification.

The Foreign Administrator's arguments have substantial force. Yet, it is not necessary to resolve these matters because the October 28, 2011 order already must be certified to the Fourth Circuit because there is at least one question of law as to which there is no controlling decision, namely whether § 365(n) must be applied in all Chapter 15 proceedings pursuant to § 1520(a). In addition, for the reasons set forth below, the October 28, 2011 order also must be certified because it involves a matter of public importance. As a result, there is no need to decide specifically whether the additional questions of law identified by the Foreign Administrator are sufficiently separable from the bankruptcy court's fact-intensive inquiry to warrant certification under § 158(d)(2).

### B.

As noted, the Foreign Administrator also argues the October 28, 2011 order is appropriate for certification because it "involves a matter of public importance." § 158(d)(2)(A)(i). As a preliminary issue, the Objectors contend that it is not sufficient that the candidate order for certification involves a matter of public importance, but that the order must contain a question of law that involves a matter of public importance. The Objectors base this argument on the fact that the "public importance" ground for

certification is in the same subsection as the "question of law" ground.   *See* §
158(d)(2)(A)(i).[16]  This argument fails; the language of the statute and weight of authority
both persuasively lead to the conclusion that an order can involve a matter of public
importance even where it does not involve a question of law that is itself a matter of
public importance.[17]   As a result, an appeal may be certified as a matter of public
importance either because it involves important legal issues or important practical
ramifications.  *See* Collier on Bankruptcy ¶ 5.06[4][b] ("Alternatively, a court may find a
matter to be of public importance if it could impact a large number of jobs or other vital
interests in a community.").

There is no Congressional guidance and only scant case law that addresses
precisely what qualifies as a matter of public importance under § 158(d)(2), but there is
no question it should be invoked only in narrow circumstances.  A leading bankruptcy
law treatise provides the following helpful guidance:

> The bar for certification under this standard should be set high.  A "matter
> of public importance" should transcend the litigants and involve a legal
> question the resolution of which will advance the cause of jurisprudence to
> a degree that is usually not the case…. Alternatively, a court may find a
> matter to be of public importance if it could impact a large number of jobs
> or other vital interests in a community.

---

[16] The Objectors also cite a single case from a bankruptcy court in the Southern District
of New York that interprets the provision in this manner.  *See In re General Motors
Corp.*, 409 B.R. 24, 28 (Bankr. S.D.N.Y. 2009).

[17] *See* Collier on Bankruptcy ¶ 5.06[4] (listing "matter of public importance" trigger as
distinct from "question of law with no controlling precedent" trigger); *In re OCA, Inc.*,
552 F.3d 413, 418 (5th Cir. 2008) (same); *Simon & Schuster, Inc. v. Advanced Marketing
Services Inc.*, 360 B.R. 429, 433 (Bankr. D. Del. 2007) (same); *Bartell*, *supra* note 8, at
174 n. 166 ("Although there are only three clauses in § 158(d)(2)(A), there are in fact
four separate grounds for certification[.]").

Collier on Bankruptcy ¶ 5.06[4][b].[18]  In other words, "[a]n appeal that impacts only the parties, and not the public at large, is not 'a matter of public importance.'"  *In re Nortel Networks Corp.*, No. 09–10138, 2010 WL 1172642, at *2 (Bankr. D.Del. Mar. 18, 2010).[19]

The October 28, 2011 order involves a matter of public importance owing to both its legal and practical ramifications.  As discussed *supra*, neither the Fourth Circuit nor the Supreme Court has provided guidance on the scope of the § 1506 public policy exception or how to implement § 1522's sufficient protection requirement.  With respect to § 1506, those courts that have addressed the provision have made one thing very clear: it should be invoked only in extremely narrow circumstances.[20]  In fact, it appears that

---

[18] *Accord Mark IV Industries, Inc. v. New Mexico Environment Dept.*, 452 B.R. 385, 388-390 (S.D.N.Y. 2011) (not a matter of public importance where resolution of the issues on appeal would not "advance the development of the law to an unusual degree, or impact the public at large").

[19] The Objectors also contend that this is not a matter of public importance because a delay would not imperil a substantial public interest.  In support, the Objectors cite a Supreme Court analysis of the collateral order doctrine which explains that a critical consideration in whether to certify an interlocutory appeal is "whether deferring review until final judgment so imperils [an] interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders."  *Mohawk Industries, Inc. v. Carpenter*, 130 S.Ct. 599, 606 (2009).  There, the Supreme Court's primary concern was setting a high bar before permitting "piecemeal, prejudgment appeals" that run counter to "the general rule that a party is entitled to a single appeal, to be deferred until the final judgment has been entered."  *Id.* at 605 (quotation marks and citations omitted).  In this context, there is no similar concern, and thus the Objectors' argument in this respect is unpersuasive.

[20] *See In re Iida*, 377 B.R. 243, 259 (9th Cir. BAP 2007) ("This public policy exception is narrow and, by virtue of the qualifier 'manifestly,' is limited only to the most fundamental policies of the United States."); *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 335-337 (S.D.N.Y. 2006) (recognizing and enforcing Canadian insolvency court's claims resolution procedure even though it did not provide for jury trial for personal injury and wrongful death claims); *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (§ 1506 is narrowly construed and does not apply simply

the § 1506 public policy exception has been used to prohibit relief or the recognition of a foreign proceeding on only two other occasions.[21]  In addition, this is the first occasion for any court to consider the role of § 365(n) in cross-border insolvency proceedings at all.

Yet, the fact that there are numerous matters of first impression at issue does not alone satisfy the public importance requirement.  The public importance here stems not only from the substantial clarification of important issues of cross-border insolvency jurisprudence that would result from resolution of this appeal, but also from the substantial ramifications that any decision will cause in the semiconductor industry and for businesses in any industry that heavily rely on patent licensing agreements.  At its heart, this matter weighs the important protections of § 365(n) against the essential role of comity in Chapter 15 proceedings.  Both are matters of substantial public importance.

The importance of § 365(n) is clear from its legislative history.  Prior to the passage of § 365(n), the Fourth Circuit held in *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043 (4th Cir. 1985) that the bankruptcy code provided for rejection of all types of executory contracts

---

because the relief granted in the foreign proceeding and the relief available in a U.S. proceeding are different); *In re Ernst & Young Inc.*, 383 B.R. 773, 781 (Bankr. D. Colo. 2008) ("The legislative history to Chapter 15 indicates this exception is to be applied narrowly and should be invoked only where the most fundamental policies of the United States are at risk.").

[21] The other two published decisions where courts have invoked § 1506 to limit relief or recognition were (i) *In re Toft*, 453 B.R. 186, 198 (Bankr. S.D.N.Y. 2011) (Section 1506 prohibits relief where "the relief sought by the Foreign Representative is banned under U.S. law, and it would seemingly result in criminal liability under the Wiretap Act and the Privacy Act for those who carried it out."), and (ii) *In re Gold & Honey, Ltd.*, 410 B.R. 357, 372-373 (Bankr. E.D.N.Y. 2009) (Section 1506 prohibits recognition of a foreign proceeding where such recognition "would reward and legitimize [a party's] violation of both the automatic stay and [the] Court's Orders regarding the stay.").

by a debtor, including intellectual property licensing agreements.  In response, Congress overturned *Lubrizol* with the enactment of § 365(n).  *See In re Qimonda AG Bankr. Litig.,* 433 B.R. at 567.  The ability of a party in bankruptcy to elect non-performance of intellectual property licensing agreements was, according to the Senate Report, a "fundamental threat to the creative process that has nurtured innovation in the United States."  *Id.* (*quoting* S.Rep. No. 100–505, at 3 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 3200, 3202)).  The passage of § 365(n), as noted by one commentator, avoided the "unjust results" of *Lubrizol* and the risk of "financial ruin" to many businesses.  *Id.* (*quoting* David M. Jenkins, Comment, *Licenses, Trademarks, and Bankruptcy, Oh My: Trademark Licensing and the Perils of Licensor Bankruptcy*, 25 J. Marshall L.Rev. 143, 149-154 (1991)).[22]

On the other hand, the central principle underlying chapter 15 is that bankruptcy proceedings be governed in accordance with the bankruptcy laws of the nation in which the main case is pending, and comity should be extended in all but the narrowest of circumstances.  *See* § 1509(b)(3) ("a court in the United States *shall* grant comity or cooperation to the foreign representative") (emphasis added).  Thus, resolution of this matter – which pits the protections of § 365(n) directly against the essential principal of comity – has legal and practical ramifications that transcend the litigants and involve matters of public importance.  In the end, whether or not the protection provided by §

---

[22] Of course, the Foreign Administrator vehemently disputes that substantial harm would result from applying German insolvency law rather than § 365(n), but suggests other ramifications, such as the impact on future cross-border insolvency proceedings, on the interpretation of cross-border insolvency provisions in other countries, and on Qimonda's many creditors.

365(n) rises to the level of a fundamental public policy to be safeguarded by § 1506, it is clear that the ultimate enforcement or abrogation of § 365(n) in these circumstances is at least a matter of public importance within the meaning of § 158(d)(2). As a result, certification for a direct appeal is appropriate on this ground, as well.

**C.**

Unable to prevail by arguing the statutory requirements of § 158(d)(2) are not met, the Objectors contend that this matter should not be certified because of the current procedural posture. Specifically, the Objectors argue that because this matter was remanded to the bankruptcy court for additional fact-finding after the district court framed the analysis, the district court – rather than the Fourth Circuit – should review whether its mandate has been satisfied. In support, the Objectors rely on the principle that an appellate court has the inherent power to enforce its mandate. *See Doe v. Chao*, 511 F.3d 461, 464-465 (4th Cir. 2007). The Objectors contend that nothing in § 158(d)(2) purports to undermine this inherent authority.

Although it is true that nothing in § 158(d)(2) purports to undermine the ability of a district court acting as an appellate court to enforce its mandate, it is also true that nothing in the statutory language or legislative history of § 158(d)(2) suggests that a matter's procedural posture has, or should have, any impact whatever on whether certification is appropriate or conditions the requirement that a district court certify an order where the statutory triggers are met on whether or not that order is the result of a remand.[23]

---

[23] While the Objectors do say "as a practical matter," the bankruptcy court's proceedings are "part and parcel" to the district court's non-final remand order, the Objectors do not

Furthermore, even if, as the Objectors argue, the district court had the option of denying certification based on the matter's current procedural posture, electing to do so would not serve the purpose or intent of § 158(d)(2). One of the primary goals of § 158(d)(2) is to provide a quicker and less costly route to resolve issues that will likely end up in the court of appeals, and this matter is surely destined for the Fourth Circuit. Of course, as the Second Circuit has pointed out, "although Congress emphasized the importance of our expeditious resolution of bankruptcy cases, it did not wish us to privilege speed over other goals," and that courts of appeals "benefit immensely" by allowing matters to "percolate" through the district courts. *Weber*, 484 F.3d at 160-161. In this instance, however, a direct appeal would not privilege speed over other goals, as this matter has already adequately "percolated" in the district court. On the first appeal, the district court set forth the appropriate standards and proper means by which to evaluate this matter. To the extent that those standards will be at issue on appeal – and it is clear that they will be – the district court has already had its say. On remand, the bankruptcy court complied with the mandate of the district court by conducting extensive

---

argue – nor could they – that this procedural posture would deprive the Fourth Circuit of jurisdiction over this appeal. Where a district court remands a matter to the bankruptcy court for further factual findings, the remand order is not a final order and, as a result, cannot be appealed. *See In re Maryland Property Associates, Inc.*, 116 Fed.Appx. 442, 444 (4th Cir. 2004). Although it incorporates the principles identified in the remand order, the October 28, 2011 order is a separate final order that may be directly appealed to the Fourth Circuit under § 158(d)(2), if the statutory requirements for certification are met. *See In re Gomez*, 404 Fed.Appx. 850, 855-856 (5th Cir. 2010) (with respect to a matter that had been remanded for further fact-finding, after bankruptcy court complied with district court's mandate, dissatisfied party "had two choices: appeal to the district court and then appeal the district court's final decision to this Court; *or obtain a statutory certification and try to appeal directly to this Court*.") (emphasis added). This is because the district court's remand order vacated the prior final order of the bankruptcy court, and now the bankruptcy court has issued a new final order, which may be certified for direct appeal to the court of appeals pursuant to § 158(d)(2).

fact-finding and applying the law as directed.  While the parties now seek review of both the standards and their application, there is no reason for the district court to revisit its own standards, and the district court is no better equipped than the Fourth Circuit to evaluate their application.  In addition, bankruptcy and district courts alike would benefit from binding precedent that addresses the application of both § 1506 and § 1522.

In sum, a direct appeal in this instance serves the two purposes of § 158(d)(2), and its advantages far outweigh the benefits of having the district court address, yet again, a matter that has already been here before.  It is important to note that neither reached nor decided here is whether the bankruptcy court struck the proper balance with respect to the parties' interests, as required by § 1522, or whether the bankruptcy court was correct that limiting the applicability of § 365(n) is "manifestly contrary to the public policy of the United States" in these circumstances.

IV.

For the foregoing reasons, the Foreign Administrator's request for certification pursuant to § 158(d)(2) is granted.

An appropriate Order will issue.

Alexandria, Virginia
May 7, 2012


_/s/_

T. S. Ellis, III
United States District Judge